**FILED**

**TIMOTHY E. ANGUS**

JUN 1 2 2008

                    **Plaintiff,**

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

v.                                          **Civil Action No.  2:07CV66**
                                            **(The Honorable Robert E. Maxwell)**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

                    **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of

the Social Security Administration ("Defendant," and sometimes "Commissioner") denying the

Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act.

The matter is awaiting decision on cross motions for summary judgment and has been referred to the

undersigned United States Magistrate Judge for submission of proposed findings of fact and

recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 83.12.

## I. PROCEDURAL HISTORY

Timothy E. Angus ("Plaintiff") filed an application for DIB on January 4, 2005, alleging

disability since November 8, 2004, due to melanoma, rheumatoid arthritis, a history of hepatitis C,

and depressive symptoms (R. 39, 46-58, 107-08).  Plaintiff's applications were denied at the initial

and reconsideration levels (R. 40-43, 46-49).  Plaintiff requested a hearing, which Administrative

Law Judge Donald McDougall ("ALJ") held on August 23, 2006, and at which Plaintiff, represented

by counsel, Regina Carpenter, and Vocational Expert ("VE") Larry Bell testified (R. 369-97).  On

October 20, 2006, the ALJ entered a decision finding Plaintiff was not disabled (R.17-28).  Plaintiff

timely filed his request for review of the ALJ's decision with the Appeals Council (R. 12). On June 29, 2007, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 6-8).

## II. STATEMENT OF FACTS

Plaintiff was forty-eight years old on his alleged onset date of disability and was fifty years old at the time of the ALJ's decision (R. 27, 375). Plaintiff has a high school education and vocational training in the use of blueprints (R. 375). His past relevant work includes that of a tool and dye maker (R. 27, 87, 375, 393).

On March 30, 2004, Najat Destani, M.D., diagnosed an irregular hyperpigmented mole on Plaintiff's back (R. 214).

Plaintiff began treatment for malignant melanoma the MacNeal Cancer Center, in Berwyn, Illinois, on June 4, 2004. John Berry, M.D., examined Plaintiff and found Plaintiff was "well-muscled"; had "minor axillary adenopathy with glands; had improved energy level after being treated for hepatitis C with Interferon; and had clear chest, normal heart, and no organomegaly (R. 150-51). Dr. Berry recommended a wider incision at the mole removal site, the removal of lymph nodes for testing, and a baseline PET scan (R. 151).

On June 21, 2004, Plaintiff was examined by James J. Greenberg, M.D., for possible wide excision of the melanoma and a full sampling biopsy of lymph nodes (R. 184).

On June 22, 2004, a PET scan showed normal results (R. 154, 183).

On July 2, 2004, Dr. Greenberg performed a biopsy of Plaintiff's lymph nodes and a wide excision of the melanoma of his back (R. 145-46).

On July 7, 2004, the pathology report of Plaintiff's lymph node biopsies showed they were

negative for metastatic melanoma, and the wide excision of melanoma biopsy showed no residual malignant melanoma (R. 146-47, 185-86).

On July 8, and 15, 2004, Dr. Greenberg examined Plaintiff and found he was doing "very" well (R. 180-81).

On July 21, 2004, Plaintiff presented to Dr. Berry. He denied any cardiovascular, respiratory, gastrointestinal, musculoskeletal, skin, or endocrine concerns. Dr. Berry found Plaintiff's heart sounds were normal and his chest was clear. Dr. Berry recommended Plaintiff be followed up at six month intervals with a complete blood count, chemical profile, and chest x-ray. Dr. Berry noted Plaintiff's back and axillary lesions were well healed and he had no organomegaly (R. 144).

On July 22, 2004, Plaintiff reported to Dr. Greenberg that he was "doing very well" and had no complaints. Dr. Greenberg noted Plaintiff's axilla incisions had healed and back incision was "clean, dry and intact." Dr. Greenberg noted Dr. Berry had found Plaintiff did not require "adjuvant therapy for" treatment of his melanoma. Dr. Greenberg opined Plaintiff could return to full activity at work in two to three weeks (R. 179).

On July 29, 2004, Plaintiff reported to Dr. Greenberg that he was "doing better" and he had experienced "no further pain involving" his left axilla. Dr. Greenberg's examination of Plaintiff revealed both incisions were well healed and a seroma had significantly decreased in size (R. 178).

On August 5, 2004, Dr. Greenberg examined Plaintiff, who reported "increasing erythema involving the left axilla about a week ago." Plaintiff stated it was improving and the pain was gone. Dr. Greenberg found Plaintiff's left axillary incision was healed and his back incision continued to "granulate and contract appropriately." Dr. Greenberg diagnosed retracting cellulitis, which Plaintiff stated was improving, and prescribed Cipro (R. 177).

3

On August 19, 2004, Dr. Greenberg examined Plaintiff and noted he was "doing well" and had "no complaints." Dr. Greenberg's examination of Plaintiff revealed his incisions were healed (R. 176).

On September 23, 2004, Jeffrey Berti, M.D., removed a mole from Plaintiff's back (R. 134); it was benign (R. 134, 138-39).

On October 5, 2004, an x-ray was made of Plaintiff's cervical spine. It was normal (R. 155).

On November 1, 2004, Plaintiff had a chest x-ray made. It "suggest[ed] [a] mass-effect on the left lateral wall of the trachea, which could be secondary to mediastinal adenopathy," but showed "no other . . . intrathoracic metastatic disease" (R. 156. 157-58).

On November 8, 2004, Plaintiff informed Dr. Destani that he had pain in his joints, was fatigued, and had experienced these symptoms for the past four to five months. Plaintiff stated he was unable to work and had to rest to reduce the symptoms. Dr. Destani found Plaintiff had arthralgia (R. 212). On November 16, 2004, Dr. Destani referred Plaintiff to a rheumatologist (R. 211).

On November 29, 2004, Plaintiff presented to Dr. Berry, who noted Plaintiff had experienced "significant morbidity with his axillary lymph node sampling, particularly on the left side where he has continued dysesthesia and the discomfort and pain that he experiences has caused him to actually quit his job as a tool and dye maker as also having to sell his Harley Davidson bike." Plaintiff informed Dr. Berry that he experienced frequent headaches, unsteadiness, tiredness, and lethargy. Dr. Berry noted Plaintiff had not had a relapse of hepatitis C and that his hemoglobin was "excellent around 16 with normal bone and liver enzyme function." Dr. Berry found Plaintiff had no adenopathy, his chest was clear, his heart sounds were normal, he had no organomegaly, his

funduscopic examination was normal, and he had no tone weakness. Plaintiff's finger-to-nose pointing, heel-to-toe maneuvers, and Romberg test were normal. Dr. Berry ordered CT scans of Plaintiff's head and chest (R. 142).

On December 6, 2004, a CT scan was made of Plaintiff's brain. It showed no hydrocephalus, no mass effect, no abnormal amount of enhancement in the brain parenchyma, and no acute metastatic disease of the brain. On that same date, a chest CT scan revealed "no mediastinal or hilar nodes of significant size" (R. 158).

On December 10, 2004, Max Harris, M.D., completed a consultative examination of Plaintiff upon referral from Dr. Destani. Dr. Harris wrote he was "stumped as to the cause of [Plaintiff's] symptoms of low grade fever, pain in his hands and discomfort in his shoulders and knees." Dr. Harris found Plaintiff's shoulder pain was "somewhat explained" by the axillary adenopathy dissection and his knee symptoms "seem[ed] to be periarticular." Plaintiff's knees showed no effusion, warmth, or erythema. Plaintiff's hands showed "a lot of squeeze tenderness and some mild swelling in the MCPs and a few PIPs and in the IP joints of the thumbs." Dr. Harris wrote Plaintiff had quit working as a machinist more than a month earlier because of his inability to work with his hands (R. 228).

Plaintiff informed Dr. Harris his hepatitis C was "totally cured." Dr. Harris reviewed Plaintiff's recent lab results, which showed normal liver enzymes, unremarkable CBC, and negative rheumatoid factor. Dr. Harris reviewed Plaintiff's December 6, 2004, chest CT scan, and found it to be "completely normal"; he found Plaintiff's abdomen CT scan was normal (R. 228).

On December 13, 2004, Plaintiff was examined by Dr. Berry, who noted CT scans of Plaintiff's chest and head reveled no cancer and found Plaintiff had "musculoskeletal morbidity

from his bilateral axillary sentinel node biopsies"; Dr. Berry opined there was no evidence "of any disease other than arthritis." Dr. Berry recommended Plaintiff return for a three-month follow up examination (R. 140).

Plaintiff's December 14, 2004, bone scan showed "increased activity in the elbows, approximately the right first metacarpal phalangeal joint, compatible with degenerative cause of uptake. No other abnormal areas of accumulation of the pharmaceutical [were] noted" (R. 159).

On December 17, 2004, Dr. Harris noted Plaintiff had "improvement of his symptoms with the Kenalog injection." Plaintiff informed Dr. Harris that his "oncologist . . . said that a lot of the symptoms seem like they could be from the surgery that he had in the infra-axillary area." Dr. Harris recommended Plaintiff increase his dosage of Celebrex.

On February 1, 2005, Linas Klygis, M.D., completed a liver report of Plaintiff relative to hepatitis C. Dr. Klygis opined there was no current evidence of hepatic encephalopathy (R. 169). Dr. Klygis found Plaintiff had completed his regimen in April of 2003 and his hepatitis C RNA levels were undetectable at that time, as well as in October, 2003, and April, 2004 (R. 170).

On February 13, 2005, Dr. Greenberg completed a neoplasm report. He noted corrective surgery had been performed and there had been no evidence or recurrence since surgery (R. 174). Dr. Greenberg did not list any other impairments or conditions by which Plaintiff was afflicted, and he did not describe or offer an opinion as to Plaintiff's ability to sit, stand, move, lift, carry, handle objects, hear, speak, or travel (R. 175).

On February 17, 2005, Plaintiff began physical therapy for shoulder and neck pain, as prescribed by Dr. Harris (R. 198-99). Plaintiff underwent physical therapy on February 22, 25, and 28, 2004, and March 2, and 3, 2004 (R. 189, 190, 191-92, 193, 196).

On March 14, 2005, Dr. Raymond Castaldo, a state agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Castaldo found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for a total of about six hours in an eight-hour work day, sit for a total of about six hours in an eight-hour work day, and push/pull unlimited (R. 201). He found Plaintiff could frequently climb ramps and stairs, balance, stoop, and kneel; could occasionally crawl and crouch; and could never climb ladders, ropes or scaffolds (R. 202). Dr. Castaldo found Plaintiff had no manipulative, visual, communicative, or environmental limitations (R. 203-04). He reduced Plaintiff's RFC to medium exertion on a sustained basis (R. 207).

On March 29, 2005, Plaintiff reported crying, irritability, not sleeping well, and finding no pleasure in daily activities to Dr. Destani. Dr. Destani diagnosed depression and anxiety, prescribed Paxil, and instructed Plaintiff to undertake a low sodium diet and increase his activity (R. 210).

On May 2, 2005, Dr. Destani diagnosed depression after Plaintiff informed him he had reduced attention span, was still irritable, cried, was not sleeping well, and was not following his diet. Dr. Destani prescribed Zoloft. Plaintiff's blood pressure was 152/84. Dr. Destani diagnosed hypertension and prescribed Zestril (R. 209).

On June 7, 2005, Dr. Destani diagnosed depression and anxiety and prescribed Lexapro to Plaintiff because Plaintiff reported Zoloft caused elevated agitation and moodiness. Plaintiff's blood pressure was 142/94. Dr. Destani prescribed Toprol (R. 208).

On June 15, 2005, Dr. Harris noted Plaintiff had undergone physical therapy for his shoulder symptoms. Plaintiff realized increased strength in his active range of motion in both shoulders therefrom (R.225).

On June 26, 2005, Dr. Frank Jimenez, a state agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push/pull unlimited (R. 235). Dr. Jimenez found Plaintiff could frequently balance, stoop, kneel, crouch, and crawl. He found Plaintiff could occasionally climb ramps and stairs but could never climb ladders, ropes or scaffolds (R. 236). Plaintiff had no manipulative, visual, communicative, or environmental limitations (R. 237-38).

On June 29, 2005, R. Leon Jackson, Ph.D., completed a Psychiatric Review Technique of Plaintiff. Dr. Jackson found Plaintiff had an impairment, which was not severe; specifically, an affective disorder (R. 242). Dr. Jackson did not make findings as to Plaintiff's limitations caused by his non-severe affective disorder due to insufficient evidence (R. 252). He found the medical evidence submitted did not "support the allegations of the claimant" (R. 254).

On August 18, 2005, Plaintiff had an x-ray made of his chest. It was unremarkable (R. 308).

On September 9, 2005, Allen G. Saoud, D.O., examined a "mole that [was] increasing in size and changing in color." Dr. Saoud diagnosed benign neoplasm and recommended Plaintiff return for evaluation if there were any changes in his condition (R. 273, 306).

On September 13, 2005, Plaintiff was examined by Paul M. Brager, M.D., of Oncology/Hematology Associates, in Clarksburg, West Virginia, for left lower back melanoma. Dr. Brager noted Plaintiff's early September, 2005, liver function tests and CBC test were normal. Plaintiff reported decreased strength and movement of his arms due to axillary node dissection, daily headaches, blurred vision, decreased hearing, occasional dysphagia, shortness of breath, chest pain,

8

joint and muscle pain, and anemia (R. 260, 285). Plaintiff stated he quit smoking cigarettes and drinking alcohol three years earlier. Dr. Brager noted Plaintiff's blood pressure was 160/100. He found Plaintiff was alert and pleasant; his neck examination was normal; he had no spinal tenderness; his cranial nerves were intact; his deep tendon reflexes were 1+ and symmetric; Plaintiff's motor strength was 5/5; and his sensation was intact. Dr. Brager's impression was for no recurrence of Stage I melanoma; hepatitis C infection; hypertension; and arthritis (R. 261, 286). Dr. Brager recommended Plaintiff return in four months for a complete blood count (R. 262, 287).

On that same date, Dr. Brager corresponded with Dr. Pearson, informing her that Plaintiff's PET scan was normal, his CT scans of his chest were negative, his blood studies were normal for liver function, and there was no recurrence of cancer. Dr. Brager wrote Plaintiff's clinical exam "remain[ed] relatively unremarkable" and that Plaintiff had "minimal arm lymphedema," for which he prescribed arm sleeves (R. 305).

On October 4, 2005, Plaintiff presented to Amy Pearson, M.D. Plaintiff reported he smoked one and one-half packages of cigarettes per day. Plaintiff informed Dr. Pearson he had hepatitis C, melanoma, lymphedema, hypertension, insomnia, chronic pain from rheumatoid arthritis, and COPD, and was medicated with Lorazepam, Toprol, Ambian, Celebrex, Cymbalta, and an Albuterol inhaler. Plaintiff complained of nervousness and anxiousness. His blood pressure was 120/88. Plaintiff's examination was unremarkable (R. 274). Dr. Pearson diagnosed depression, anxiety, hepatitis C, melanoma, hypertension, insomnia, COPD, and chronic pain (R. 274-75). Plaintiff informed Dr. Pearson that he had taken his brother's Diazepam tablets, which "helped"; she suspended Plaintiff's prescription for Lorazepam and prescribed Niravam (R. 275).

On October 5, 2005, Dr. Pearson completed a Physical Residual Functional Capacity

Questionnaire of Plaintiff. Dr. Pearson listed Plaintiff's diagnoses as hepatitis C, melanoma, lymphedema, hypertension, insomnia, COPD, chronic pain. She opined Plaintiff's prognosis was good. Dr. Pearson wrote Plaintiff's symptoms were fatigue, anxiety, depression, and pain. She noted Plaintiff's pain was in the lumbar area and was persistent. Dr. Pearson based her opinions on the following clinical findings and objective signs: "discomfort to palpation L-spine" and "lymphedema [with] use of upper ext." Dr. Pearson found Plaintiff's impairments had lasted or were expected to last for twelve months (R. 331). She opined Plaintiff was not a malingerer. She listed depression and anxiety as the emotional factors that contributed to the severity of Plaintiff's symptoms and functional limitations. Dr. Pearson found Plaintiff's impairments were reasonably consistent with his symptoms and functional limitations. Dr. Pearson opined Plaintiff's pain and other symptoms frequently interfered with his attention and concentration. She also opined Plaintiff was incapable of "even 'low stress' jobs" because he was very anxious (R. 332). Dr. Pearson did not make findings as to Plaintiff's walking, sitting, or standing limitations before requiring a break; his ability to sit and stand/walk in a workday; his need to walk and the frequency and duration of such walking; his need to shift, at will, from sitting, standing or walking; his need to take unscheduled breaks; his need for an assistive device; his ability to lift and carry; his ability to twist, stoop, crouch, squat, climb ladders, climb stairs; his ability to reach, handle or finger; his ability to use his hands to grasp and turn and twist objects; his ability to use his fingers for fine manipulation; his ability to use his arms to reach, including overhead reaching; Plaintiff's having good days and bad days; and how many days per month Plaintiff would be absent from work due to his impairments or treatments therefor (R. 332-34).

On October 11, 2005, Plaintiff telephoned Dr. Pearson and informed her that Niravam was

10

not "working" and requested a prescription for Diazepam. Dr. Pearson honored the request (R. 275).

On October 18, 2005, Plaintiff presented to Muqdid A. Zuriqat, M.D., with complaints of shortness of breath (upon exertion) and frequent panic/anxiety attacks. Plaintiff informed Dr. Zuriqat he had smoked for twenty-five years, but had stopped three years earlier. Plaintiff's chest was negative for wheezing. Dr. Zuriqat diagnosed asthma, bronchitis and panic attacks and prescribed Singulair and Albuterol (R. 281).

On November 8, 2005, Plaintiff telephoned Dr. Pearson and requested a refill on his Diazepam prescription. Dr. Pearson refilled the prescription (R. 275).

On November 8, 2005, Plaintiff reported to Dr. Zuriqat that Singular helped. His chest was clear to wheezes. Dr. Zuriqat diagnosed asthma and bronchitis and prescribed Advair (R. 279, 343).

On November 10, 2005, Plaintiff underwent an echocardiogram. It was within normal limits (R. 276, 278, 346).

On December 6, 2005, Dr. Zuriqat diagnosed asthmatic bronchitis and prescribed Prilosec and Advair. He instructed Plaintiff to return in three months (R. 277, 344).

On December 8, 2005, Kasim Kazbay, M.D., ordered a "check" of Plaintiff's viral enzymes, alphafetoprotein, and titers relative to his hepatitis C (R. 300).

On January 4, 2006, Plaintiff presented to Dr. Pearson with complaints of difficulty urinating, feeling a "little depressed," weight gain, and mild lymphedema. Plaintiff was interested in obtaining Viagra. He reported he had "seen Dr. Klein for marital discord secondary to his wife's mood swings." Plaintiff informed Dr. Pearson that Dr. Zurquat had prescribed Advair and Singulair, which had "really helped him breathe better." Dr. Pearson's examination revealed Plaintiff was alert and pleasant; his examination was normal. Dr. Pearson assessed depression, hepatitis, melanoma,

lympehdema, hypertension, insomnia, chronic pain, and COPD (R. 269). Dr. Pearson recommended Plaintiff discuss treatment by a psychiatrist with Psychologist Klein; she continued him on Lorazepam; she recommended he receive treatment with a urologist; she provided him samples of Viagra; and Dr. Pearson instructed Plaintiff to return in three months (R. 270).

On January 12, 2006, Plaintiff complained to Dr. Brager that he had arm swelling and axillary pain, even with the use of "sleeves." Plaintiff also experienced asthma symptoms. Plaintiff's blood pressure was 148/96 and his examination was normal. Plaintiff's motor strength was 5/5 and his sensation was intact. He had no palpable lymphadenopathy. Dr. Brager diagnosed no recurrence of Stage I melanoma, bilateral arm lymphedema, and asthma (R. 257, 284).

On January 25, 2006, Robert J. Klein, Ed.D., of the Family & Marital Counseling Center, Inc., completed a Summary of Services of Plaintiff. Psychologist Klein noted Plaintiff had first been seen at the center on September 28, 2005; he had had eight appointments at the center; the eight appointments included one on January 25, 2006. Psychologist Klein wrote Plaintiff continued in psychotherapy and that his medical condition, based "on observations for the above time frame of 5 months continue[d] to appear to be deteriorating." Psychologist Klein listed the following diagnoses: Axis I – major depressive disorder, recurrent, severe, with psychotic features; posttraumatic stress disorder; and generalized anxiety disorder; Axis II – no diagnosis; Axis III – lymphoedema (active) and hepatitis C (dormant); Axis IV – medical, economic, and financial factors; and Axis V – GAF 55 (past year) and 50 (current). Psychologist Klein wrote that the "nature and severity of [Plaintiff's] physical symptoms continue[d] to be credible and consistent with objective medical findings." Psychologist Klein also wrote that the "nature and severity of [Plaintiff's] psychological symptoms continue[d] to be consistent with the clinical analysis caused

by his loss of any physical ability to perform any physical labor." Psychologist Klein opined that Plaintiff's depression was severe and that he experienced flashbacks and nightmares due to the "trauma of the debilitating cancer and its impact on all areas of [Plaintiff's] ego state are overwhelming to him." Psychologist Klein wrote observations by the "average laymen would confirm the effects of the cancer" (R. 289).

Psychologist Klein wrote Plaintiff was in a constant state of anxiety, psychotropic medications were minimally effective, and his prognosis was poor. Psychologist Klein wrote that "as based on medical findings [Plaintiff] [was] not capable of performing any type of work on either a part time or full time basis. He has to wear lymphoedema garments on both arms. Here is a man who could lift weights, hunt, fish, ride a motorcycle, operate a fork lift, be a productive member of his occupation, work on any mechanical problem. Now, he is not even able to mount a motorcycle, stand the vibrations to his arms and body, or control its movement or direction. Here is a person who cannot now lift any weight without the swelling occurring in the absence of any lymph nodes in his arm pits without causing severe edema to his arms. Let any person observe his physical condition! Here is a person who is in constant pain caused by a deteriorating physical condition that does not appear to offer any possibility of recover to ever work again! One look at recent photographs of his present physical condition tells his story!" (R. 290).

On January 25, 2006, Psychologist Klein completed a Medical Assessment of Ability to do Work-Related Activities (Mental) (R. 291). Psychologist Klein found Plaintiff's abilities to follow work rules, to relate to co-workers, to deal with the public, to use judgment, and to interact with supervisors were poor (R. 291-92). Psychologist Klein found Plaintiff had no ability to deal with work stresses, to function independently, or to maintain attention or concentration. In the section

of the assessment where Psychologist Klein was to describe any limitations and include the medical/clinical findings that support these assessments, Psychologist Klein did not describe or include any limitations or findings. Instead he wrote, "Please see cover letter report," which was reference to the previously detailed "Summary of Services," completed on January 25, 2006. Psychologist Klein found Plaintiff's abilities to understand, remember and carry out complex job instructions; understand, remember and carry out detailed, but not complex job instructions, and understand, remember and carry out simple job instructions were poor (R. 292). Psychologist Klein found Plaintiff's abilities to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability were poor due to "severe depression, PTSD, generalized anxiety disorder." When asked to list other work-related activities which were affected by Plaintiff's condition, Psychologist Klein wrote, "Please see cover letter report," which was reference to the above detailed "Summary of Services," completed on January 25, 2006. Psychologist Klein found Plaintiff could manage his own benefits (R. 293).

On February 7, 2006, Safwat Attia, M.D., a psychiatrist, completed a psychiatric evaluation of Plaintiff. Dr. Attia noted Plaintiff was a married, unemployed individual, who collected retirement. He went to the evaluation by himself and provided the information to the doctor. Plaintiff's main concern was that it "bother[ed] him that he could not "do the things [he] used to do." Plaintiff informed Dr. Attia that he "suffer[ed] from several medical problems that interfere[d] with his ability to work or do activities that he enjoy[ed]." He stated he had hepatitis C in 2003 and had been diagnosed and treated for cancer in 2004 (R. 303).

Plaintiff stated he had medicated with Zoloft and Paxil, was taking Cymbalta at the time of the evaluation, and medicated with Ativan as needed. Plaintiff stated the medication had been

helpful. Plaintiff reported he took Ambien CR to help him sleep, but he "[kept] waking up and [had] recurrent nightmares" (R. 303).

Plaintiff reported he felt worried, felt unhappy, had memory problems, became aggravated easily, and had multiple physical symptoms. Plaintiff stated he did household chores and watched television. Plaintiff stated he had been receiving counseling for the past three months. Plaintiff had not been hospitalized or treated for psychiatric symptoms. He denied suicidal attempts and any history of abuse. Plaintiff denied any history of smoking; he stated he stopped drinking alcohol in 2002; Plaintiff stated he experimented with marijuana and barbiturates in the 1970's (R. 303).

Plaintiff's current medical conditions included asthma, which he treated with Advair, Albuterol, and Singular; arthritis, which he had treated with Celebrex; head trauma from a motorcycle accident; and hypertension, which he had treated with Toprol (R. 303-04). Plaintiff stated he had a high school education, during which he received average grades, and had attended trade school. He worked as a laborer until 2004, when he quit his job due to his health (R. 304).

Dr. Attia's mental status examination revealed Plaintiff was fairly dressed and groomed. He wore pressure sleeves on both arms. He was anxious and his affect was sad. Plaintiff was cooperative and showed no involuntary movements. Plaintiff's speech was clear. He denied homicidal or suicidal thoughts or hallucinations. Plaintiff's intelligence was average and his memory was fair. Plaintiff had fair insight, fair abstract thinking, and a fair fund of knowledge of events in the media. Plaintiff's judgment to hypothetical situations was simple. Plaintiff had difficulty with concentration, but he was alert and oriented to time, place, person, and situation. He was able to interpret proverbs (R. 304).

Dr. Attia made the following diagnosis: Axis I – depressive disorder, not otherwise specified,

and generalized anxiety disorder; Axis II – no diagnosis; Axis III – bronchial asthma, arthritis, status post cancer surgery, hypertension; Axis IV – moderate stressor related to medical and financial difficulties; and Axis V – GAF was 65 (R. 302, 304). Dr. Attia's treatment plan was for psycho-pharmacotherapy, which included Plaintiff continuing treatment with his current medications, with adjustments to the dosage, and for continued psychotherapy (R. 302).

On February 13, 2006 Plaintiff returned to Dr. Kazbay, who found Plaintiff's liver enzymes were within normal limits and viral titers were undetectable. Plaintiff had no "significant complaints"; Dr. Kazbay recommended Plaintiff have his liver enzymes evaluated every two years. Plaintiff was instructed to return as needed (R. 294).

On February 21, 2006, Plaintiff returned to Dr. Zuriqat. His blood pressure was 122/80. He complained of "arthritis symptoms." Plaintiff's examination was normal; Dr. Zuriqat diagnosed asthmatic bronchitis and prescribed Singular and Spiriva (R. 342).

On March 16, 2006, Plaintiff had an x-ray made of his right knee. It showed a bipartite patella and degenerative changes with possible mild lateral positioning of the patella (R. 323). An x-ray of Plaintiff's left elbow showed mild degenerative joint disease and no other bony abnormality (R. 320). The x-ray of Plaintiff's right hand "suggest[ed] degenerative joint disease" and "[n]o changes of rheumatoid arthritis [were] noted" (R. 319). The x-ray of Plaintiff's left hand showed "[c]hanges suspicious for degenerative joint disease" and "[r]heumatoid arthritis [was] thought less likely" (R. 318).

Also on March 16, 2006, Plaintiff's ANA test was negative; his Complement C3 and C4 tests were within normal range; his angiotensin 1 test was within normal range; Plaintiff's cyclic citrullinated IGG test was negative; his Smith and RNP antibody tests were negative; and Plaintiff's

Sjorgren's SSA antibody and SSB antibody tests were negative (R. 311-17).

On June 5, 2006, Plaintiff was prescribed Advair by Dr. Zuriqat (R. 341).

On June 6, 2006, Plaintiff returned to Dr. Attia for a follow-up appointment. He was fairly dressed and groomed. His affect was neutral. Plaintiff reported he was taking his medications as prescribed. He denied any negative side effect to the medication; he stated the medication had been "helpful." Plaintiff reported he was getting along well with others and his mood had improved. Plaintiff was advised "about a possible reduction in the frequency of visits"; he was agreeable to that recommendation. Dr. Attia's assessment was that Plaintiff was responding fairly to his treatment. Dr. Attia continued Plaintiff on his current medications and reduced his therapy sessions to once a month (R. 301).

On June 8, 2006, Plaintiff presented to Dr. Brager with complaints of coldness, numbness, and "some persistent lymphedema" in his arms. Plaintiff's blood pressure was 158/96; his examination was normal. Plaintiff's motor strength was 5/5 and his sensation was intact. He had no palpable lymphadenopathy. Dr. Brager diagnosed no recurrence of Stage I melanoma and positive bilateral arm lymphedema and neuropathy. Dr. Brager's plan of treatment was for "reassurance" and "no treatment." He instructed Plaintiff to return in four months for CBC, liver function test, chest x-ray, and examination (R. 256).

On June 19, 2006, Plaintiff presented to Dr. Zuriqat and complained of shortness of breath with exertion. His blood pressure was 120/84. His examination was normal. Dr. Zuriqat diagnosed asthmatic bronchitis and provided Plaintiff samples of Spiriva (R. 340).

On June 22, 2006, a CT scan was taken of Plaintiff's thorax; it was negative (R. 336, 356).

On June 27, 2006, Plaintiff presented to Dr. Zuriqat for examination; it was normal; his blood

pressure was 134/81. Dr. Zuriqat diagnosed asthmatic bronchitis and prescribed Spiriva (R. 338-39).

Plaintiff presented to Dr. Pearson on July 5, 2006, for a six-month follow up. Plaintiff stated he was "very tired"; was not sleeping, but was medicating with Ambian, which "help[ed]"; had had an asthma attack, for which he had been prescribed Spiriva, which helped "tremendously"; had arm pain; and felt depressed and anxious, but was receiving psychiatric care and taking Celebrex, which "help[ed]." Plaintiff reported he had been examined by a rheumatologist for a "history of RA," and he was "completely negative" for rheumatoid arthritis. Dr. Pearson found Plaintiff was alert and pleasant; his examination was normal. Dr. Pearson observed a neck adenopathy that she had "not noticed before." Dr. Pearson's assessment was for fatigue and adenopathy right neck (R. 263).

On July 5, 2006, Plaintiff's lipid profile showed his HDL was 268; his LDL was 187. Dr. Pearson noted, on July 7, 2006, that Plaintiff had to "watch diet" and increase exercise to treat his elevated cholesterol (R. 268).

On July 18, 2006, Psychologist Klein completed a Summary of Services of Plaintiff. Psychologist Klein noted Plaintiff had first been seen at the center on September 28, 2005; he had twelve appointments at the center; the twelve appointments included one on June 6, 2006. Psychologist Klein wrote Plaintiff continued in psychotherapy and that his medical condition, based "on observations for the above time frame of 10 months continue[d] to appear to be deteriorating." Psychologist Klein opined Plaintiff's psychological problems "are moderately improving." Psychologist Klein listed the following diagnoses: Axis I – major depressive disorder, recurrent, severe, with psychotic features; posttraumatic stress disorder; and generalized anxiety disorder; Axis II – no diagnosis; Axis III – lymphoedema (active) and hepatitis C (dormant); Axis IV – medical, economic, and financial factors; and Axis V – GAF 55 (past year) and 50 (current). Psychologist

Klein wrote that the "nature and severity of [Plaintiff's] physical symptoms continue[d] to be credible and consistent with objective medical findings." Psychologist Klein also wrote that the "nature and severity of [Plaintiff's] psychological symptoms continue to be consistent with the clinical analysis[]. The emotional trauma caused by his loss of any physical ability to perform any physical labor remain severe." Psychologist Klein opined that Plaintiff's depression was severe and that he experienced flashbacks and nightmares due to the "trauma of the debilitating cancer . . . ." Psychologist Klein noted Plaintiff's "ego state continue[d] to appear to be overwhelming to him" and that [o]bservations by the average laymen would confirm the effects of the cancer" (R. 271).

On July 25, 2006, Plaintiff reported to Dr. Zuriqat that his shortness of breath had improved while taking Spiriva. Plaintiff's examination was normal. His blood pressure was 117/78. Dr. Zuriqat diagnosed asthmatic bronchitis and continued Plaintiff's Spiriva prescription (R. 335).

On August 14, 2006, Dr. Pearson corresponded with Plaintiff's counsel. She wrote she had treated Plaintiff since August 17, 2005, usually once or twice per month. Dr. Pearson wrote Plaintiff's diagnoses and symptoms included hypertension, COPD, asthma, depression/anxiety, hepatitis C and melanoma. Dr. Pearson noted Plaintiff had a past history of lymph node resection bilateral axillae, wide excision of his back secondary to the melanoma, and "frequent bronchitis and asthmatic exacerbations which have required hospitalizations." Dr. Pearson wrote that Plaintiff had had "such difficulty with his upper extremities secondary to the lymph node resection that he [was] unable to perform much activity without pain and discomfort." Dr. Pearson opined that Plaintiff's anxiety and depression was "so significant that [Plaintiff] [was] unable to concentrate or function well at all." Dr. Pearson informed Plaintiff's counsel that it was her opinion that Plaintiff was incapable of "performing any type of full-time work" due to depression, anxiety, and pain caused

by the lymph node resectioning (R. 329).

<u>Administrative Hearing</u>

At the administrative hearing, Plaintiff testified he had been treated with Interferon and Rebutol for hepatitis C, which had kept the condition "in check" and for which he was no longer being treated. He stated the surgery for cancer "did [him] in" and he was "never the same man after that" (R. 377). Plaintiff testified that his hands would swell, get numb and tingle and that he'd "lost a lot of strength" after the surgery (R. 378, 387). Plaintiff stated he treated these symptoms with keeping his arms elevated and wearing "sleeves" (R. 378). Plaintiff stated he rested his arms for one and one-half hours per day (R. 391). Plaintiff testified his hands and arms were always swollen (R. 387). Plaintiff stated he had difficulty with buttons and zippers and his wife buckled his belt. Plaintiff testified his hands would go numb when his arms were at table level. Plaintiff could not write "like [he] used to do" (R. 388). Plaintiff testified he used the mouse on the computer to browse, but his hand would get cold. Plaintiff could raise his arms to neck level and he had difficulty reaching in front and to the side with his arms (R. 389). Plaintiff stated he had arthritis, which he treated with Celebrex, which relieved pain (R. 380). Plaintiff testified his asthma was improved with Spiriva (R. 381). Plaintiff stated his depression was caused by his inability to work and made him feel "worthless" (R. 383). Plaintiff was treated for depression by a counselor twice per month and by a psychiatrist once per month (R. 390). His shortness of breath was triggered by his climbing stairs too quickly or carrying groceries up or down stairs. He testified that asthma medication helped relieve his symptoms. Plaintiff testified his hypertension was under control with medication (R. 384).

Plaintiff stated he had difficulty lifting a gallon of milk (R. 379). His legs would "get tired,"

which caused difficulty with standing and walking (R. 380). Plaintiff stated he watched short programs on the television so he could "follow" them. His mind wandered when he watched long programs, such as a movie (R. 385).

Plaintiff testified he awoke, let out the dog, ate breakfast, sat outside, took a nap for one and one-half hours each day, watched news on television, let out the dog again, ate lunch, watched television, sat with arms elevated, lay down, ate dinner, watched television, and tried to read "a little" (R. 384). Plaintiff testified he lay down for three hours per day (R. 391). Plaintiff stated he shopped for groceries and that he drove, but not long distances (R. 379-80, 386). He stated he "drop[ped] a lot of things." He did light dusting. Plaintiff testified he did not visit or receive visits from others as often as he used to do. Plaintiff testified he did not go to church or eat in restaurants. His hobby was stargazing with a telescope and binocular (R. 385).

Received During the Administrative Hearing

Letters from individuals, who wrote about Plaintiff's limitations, were submitted to the ALJ during the administrative hearing[1]. They were as follows:

- On April 30, 2005, Jonathan Kirby wrote that Plaintiff had to rely on others to lift "even light things" after the surgery to remove the melanoma and lymph nodes. Mr. Kirby wrote that Plaintiff's arms were swollen, he was tired, he was "sad," and he was in pain (R. 103, 132);

- Kathleen Angus wrote, in a letter dated May 3, 2005, that Plaintiff had difficulty lifting more than ten pounds above his head after the surgery to remove the melanoma and lymph nodes. Plaintiff could not exercise, bowl, or complete household chores. He could not use his hands to pick up small objects due to rheumatoid arthritis. Ms. Angus wrote Plaintiff's arms would swell and become "sore." Plaintiff was tired and had to take naps in the day. He could not kneel. She

---

[1]These letters were also part of the evidence of record prior to the administrative hearing. They were included in the Disability Related Development and Documentation evidence, labeled as Exhibit 5E (R. 1-2).

wrote Plaintiff was depressed, did not provide "complete attention" to her when she spoke to him, and had become a "hermit." Plaintiff's "mind [was] not fully on the program" when he watched television (R. 102, 131);

- Joseph Schultz wrote, on May 9, 2005, that he had observed a drastic change in Plaintiff since he had become ill. Chores were a challenge; going to work was impossible; he had become depressed and irritable; he could not bow or lift weights; he did not want people to visit him (R. 105, 130);

- Witold Zabawski's May 20, 2005, letter read Plaintiff had changed after his operation in that he had "lost his sense of humor and passion for work" (R. 104, 129);

- Lori Radkiewicz's letter, dated May 24, 2005, contained her opinion that since Plaintiff had become ill, had surgery, and was unable to work, he had become "very depressed and frustrated" as he could not do "the things he used to do" (R. 106, 128).

## Received Subsequent to the Administrative Hearing

On July 11, 2006, Plaintiff's abdomen x-ray showed left renal calculi (R. 355).

On July 18, 2006, Plaintiff's neck ultrasound showed enlarged lymph nodes, without fatty centers, in the right side. A CT scan of Plaintiff's neck was recommended (R. 348).

On July 31, 2006, a CT scan was made of Plaintiff's neck. It was negative (R. 347).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ McDougall made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2009 (R. 19).

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b)) (R. 19).

3. The claimant has the following severe impairments: hepatitis C; history of melanoma of the back; bilateral arm lymphedema; asthma; osteoarthritis; and hypertension (20 CFR 404.1520(c)) (R. 19).

4. The claimant does not have an impairment or combination of impairments that meets

22

or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526) (R. 22).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the demands of light work with certain modifications. He can perform no overhead reaching and no reaching more than 18 inches in front of the body. He can perform all postural movements on an occasional basis, except he cannot climb ladders, ropes, scaffolds, stairs, or ramps. He can have no exposure to more than moderate or average levels of fumes, dusts, gases, or other respiratory irritants. He must be able to miss up to one day of work per month (R. 22-23).

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565) (R. 27).

7.     The claimant was born on June 30, 1956, and was 48 years old on the alleged disability onset date, which is defined as a younger individual. Since attaining age 50 on June 29, 2006, the claimant is considered to be closely approaching advanced age (20 CFR 404.1563) (R. 27).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564) (R. 27).

9.     The claimant's limitations preclude the transferability of acquired job skills (20 CFR 404.1568) (R. 27).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566) (R. 27).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court

disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B.  Contentions of the Parties

Plaintiff contends:

1.  The ALJ's decision in this matter must be reversed because the ALJ erred in finding that Plaintiff had no severe mental impairment.

2.  The ALJ's decision must be reversed because the ALJ erred in failing to afford appropriate weight to the opinions of Plaintiff's treating psychologist as required by SSR 96-2p.

3.  The ALJ erred in failing to properly evaluate Plaintiff's credibility and failing to evaluate the corroborating evidence from friends and family in making his credibility determination.

The Commissioner contends:

1.  Substantial evidence supports the ALJ's determination that Plaintiff's nonsevere mental impairment was not disabling.

2.  Substantial evidence supports the ALJ's determination that Plaintiff was not fully credible about the nature and extent of his functional limitations.

## C. Mental Impairment

Plaintiff contends the ALJ's decision must be reversed because he erred in finding that Plaintiff had no severe mental impairment. Defendant asserts that substantial evidence supports the ALJ's determination that Plaintiff's non-severe mental impairment was not disabling.

20 C.F.R. §404.1521 defines what is meant by a non-severe impairment. It reads as follows:

(a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitude necessary to do most jobs. Examples of these include –

. . .

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

The ALJ found Plaintiff's mental impairment was not severe. He opined:

Considering the longitudinal record, the undersigned finds that the claimant has failed to establish the presence of any severe mental impairment during the period in question. The medical records establish that the claimant had 12 psychotherapy sessions with Psychologist Klein during the period September 28, 2005 through June 6, 2006. Unfortunately, the reports from this psychologist (Exhibits 13F and 19F) contain no detailed mental status findings. Instead, they relate the reported diagnoses, major depressive disorder, recurrent, severe, without psychotic features, posttraumatic stress disorder, and generalized anxiety disorder to the claimant's general complaints of inability to work and perform prior activities due to his physical impairments. In the reports, Psychologist Klein rated the claimant's Global Assessment of Functioning (hereinafter GAF) in the 50 to 55 range or moderate impairment according to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, page 32 or page 34 in the Revised Text (DSM-IV). Psychologist Klein also submitted a medical assessment from January 25, 2006, in which he

opined that the claimant had a "poor" or "none" ability to perform mental work-related activities (Exhibit 20F). However, he has failed to support these opinions by any contemporaneous medical records, and having reviewed his reports, the undersigned finds that his opinions are based primarily on a consideration of the claimant's alleged physical symptoms, including pain, as opposed to objective mental status findings (R. 20).

The opinions of Psychologist Klein are also inconsistent with the detailed findings reported by Dr. Attia, the claimant's treating psychiatrist. When initially evaluated by Dr. Attia on February 7, 2006, the claimant reported that his main concern was his inability to perform his prior activities. The claimant reported that Cymbalta, his currently prescribed medication, had been helpful. He complained of continued problems sleeping despite taking Ambien. Based on the evaluation, Dr. Attia diagnosed the claimant as having a depressive disorder, not otherwise specified, and generalized anxiety disorder. He rated the claimant's GAF at 65, or a mild impairment according to DSM-IV. On June 9, 2006, Dr. Attia reported that the claimant was responding fairly well to his treatment. He noted that the claimant was advised about a possible reduction in the frequency of visits (Exhibit 22F) (R. 20).

The ALJ did not rely on Psychologist Klein's opinions as to Plaintiff's mental limitations found in his two letters and his Medical Assessment of Ability to do Work-Related Activities (Mental) because the information contained in those documents was not supported by a mental status examination. 20 C.F.R. §416.913 defines the type of objective medical evidence to be used to provide evidence of mental impairment: "(b) Medical reports. Medical reports should include – . . . (2) Clinical findings (such as the results of . . . mental status examinations) . . . ." The ALJ found Psychologist Klein based his opinions on Plaintiff's alleged physical symptoms and not objective mental status findings (R. 20). To determine if Plaintiff's mental impairments were severe, the ALJ relied on Plaintiff's treating psychiatrist, Dr. Attia, who completed a psychiatric evaluation of Plaintiff on February 7, 2006. That report included information about Plaintiff's history of his present illness, past psychiatric history, alcohol and drug abuse history, medical history, family and social history, and a mental status examination, all information on which Dr. Attia relied to diagnose

depressive disorder, not otherwise specified, and generalized anxiety disorder. Dr. Attia did not make a finding that Plaintiff had PTSD (R. 303-04). The ALJ considered Plaintiff's chief complaint, which was he was concerned about his inability to perform his prior activities. The ALJ evaluated Plaintiff's report that Cymbalta helped his depression; Dr. Attia's finding that Plaintiff's GAF at 65; and Dr. Attia's finding that Plaintiff was responding fairly well to his treatment and could reduce the frequency of his visits (R. 20). The ALJ also based his finding that Plaintiff's mental impairment was not severe by evaluating Plaintiff's activities of daily living, social functioning, and concentration, persistence, and pace.

The ALJ evaluated Plaintiff's functional areas – activities of daily living; social functioning; concentration, persistence, pace; and episodes of decompensation – and found Plaintiff had mild limitations in the first three areas and had none in the fourth. The ALJ's finding that Plaintiff had a mild limitation in his activities of daily living was based on Plaintiff's statements to Dr. Attia that he did some housework and watched television and Plaintiff's testimony he did some light cleaning, cooking, shopping, stargazing with a telescope, read, and watched a lot of television. The ALJ found Plaintiff's social functioning was mildly limited and based this finding on Dr. Attia's opinion that Plaintiff was cooperative and had no speech or articulation problems; Dr. Pearson's finding that Plaintiff was alert and pleasant; and Plaintiff's statements on June 9, 2006, that he got along well with others. The ALJ found Plaintiff had a mild limitation in his concentration, persistence, or pace and based this finding on Dr. Attia's opinion that Plaintiff was of average intelligence; had fair memory; and had difficulty with his concentration, but was alert and fully oriented and Plaintiff's testimony that he watched television and drove a vehicle. The ALJ found Plaintiff had not experienced any episodes of decompensation and based this finding on Plaintiff's failing to

"document" any such episodes and his not having required any inpatient treatment (R. 21). "If we rate the degree of your limitation in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area, we generally conclude that your impairment(s) is not severe, . . . ." *See* 20 C.F.R. §404.1520a(d)(1). The analysis of the evidence and the conclusions the ALJ drew therefrom support his decision that Plaintiff's mental impairment was not severe as it did not significantly limit his mental ability to do basic work activities.

Plaintiff also asserts that Psychologist Klein's opinions as to Plaintiff's limitations were supported by Dr. Pearson, Plaintiff's treating physician, who opined Plaintiff's "depression and anxiety is so significant that he is unable to concentrate or function well at all. I don't believe that [Plaintiff] is capable of performing any type of full-time work at this time secondary to the anxiety and depression . . ." (Plaintiff's brief at p. 7, R. 329). As to this opinion, the ALJ found:

> On October 5, 2005, Dr. Pearson submitted responses to a physical residual functional capacity questionnaire. However, she submitted no opinions regarding the claimant's physical limitations. She did opine that the claimant's depression and anxiety would frequently interfere with the claimant's attention and concentration needed to perform even simple work tasks and that he was incapable of even "low stress" jobs (Exhibit 26F). The undersigned rejects these opinions regarding the claimant's mental limitations as they are obviously based on the claimant's subjective complaints. Further, Dr. Pearson is not a mental health professional and her opinions regarding the claimant's mental abilities are inconsistent with the above-detailed findings reported by Dr. Attia (R. 26).

> In a letter submitted on August 14, 2006, Dr. Pearson opined that the claimant was incapable of performing any type of full-time work secondary to his anxiety and depression . . . . the undersigned finds that this opinion on the ultimate issue reserved to the Commissioner . . . (R. 26).

The ALJ was correct in rejecting Dr. Pearson's opinion as to Plaintiff's mental limitations for the reasons he asserted. Dr. Pearson's opinion that Plaintiff is unable to perform any type of full time work is an issue reserved to the Commissioner because it is an administrative finding that is

28

dispositive of a case; *i.e.*, that would direct the determination or decision of disability. A statement by a medical source that a claimant is "disabled" or "unable to work" does not mean that the Commissioner will determine that the claimant is disabled. 20 C.F.R. 404.1527(e)(1) expressly provides that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." Finally, "a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." These opinions, therefore, cannot be accorded controlling weight or even any special significance.

Dr. Pearson neither completed nor relied on a objective mental evidence in making her assessment of Plaintiff's limitations due to mental impairments. Her findings, as addressed by the ALJ, were found in a Physical Residual Functional Capacity Questionnaire, which did not address Plaintiff's physical limitations. Dr. Pearson's opinion that Plaintiff's depression and anxiety were so "significant that he was unable to concentrate or function well at all" was expressed in a letter she authored to Plaintiff's counsel. Dr. Pearson diagnosed depression and anxiety on October 4, 2005, based on Plaintiff's "complaints of feeling nervous and anxious and still feeling depressed" (R. 274). On January 4, 2006, Plaintiff informed Dr. Pearson that he was feeling a "little depressed," and she assessed depression (R. 270). On July 5, 2006, Plaintiff reported to Dr. Pearson that he felt depressed and anxious; she included a diagnosis for each in her assessment (R. 263). During Dr. Pearson's treatment of Plaintiff, she did not diagnose PTSD. Dr. Pearson did not base her diagnoses and opinions as to Plaintiff's depression and anxiety on any medical reports; she relied on Plaintiff's subjective statements.

Dr. Pearson, a medical doctor, did not treat Plaintiff for depression and anxiety; he was treated by a psychologist and psychiatrist. Dr. Pearson referred Plaintiff to the care of Dr. Attia (R.

303). The ALJ relied on the opinion and diagnoses of Dr. Attia, Plaintiff's treating psychiatrist, as to Plaintiff's mental impairments, which, according to 20 C.F.R. 404.1527(d)(5), is permitted. It reads: "Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." Additionally, Dr. Pearson's opinion, although consistent, in part, with the opinions expressed by Psychologist Klein, are inconsistent with the opinions of Dr. Attia and other parts of the record of evidence. Dr. Attia found Plaintiff had difficulty with concentration, but he was alert and oriented as to time, place, person, and situation; he could interpret proverbs; his intelligence was average (R. 304). After being in Dr. Attia's care for four months, Plaintiff reported his mood was improving and the medication was "helpful." Dr. Attia found Plaintiff was responding to his treatment (R. 301). In addition to Dr. Pearson's opinions being inconsistent with the opinions of Dr. Attia, they are inconsistent with Plaintiff's statements to her. Plaintiff reported to Dr. Pearson on October 4, 2005, that his counseling sessions "seem[ed] to be helping"; on January4 2006, Plaintiff reported feeling only a "little depressed" and informed her he had begun counseling with Psychologist Klein "for marital discord secondary to his wife's mood swings"; on July 5, 2006, Plaintiff reported to Dr. Pearson that the psychiatric care and his medicating with Celebrex "help[ed]" his depression and anxiety symptoms (R. 263, 269, 274). The ALJ is supported in his decision of Dr. Pearson's opinions about Plaintiff's mental impairments.

In addition to asserting the ALJ erred in his decision by finding Plaintiff's mental impairments to be non-severe, Plaintiff argues that the ALJ's analysis to reach that decision is flawed. Plaintiff contends the ALJ "used the criteria of the Listings, which are at Step Three of the sequential evaluation, to assess whether [Plaintiff] had a severe impairment at Step Two . . . .,"

which is an error (Plaintiff's brief at p. 7). Defendant asserts Plaintiff's contention "demonstrates a basic misunderstanding as to the relationship between these factors and the severity determination at step two" (Defendant's brief at p. 9). The undersigned agrees with Defendant's argument.

20 C.F.R. §404.1520a mandates a "special technique" that must be applied and followed by an ALJ in evaluating mental impairments. It reads:

(a)    *General.* The steps outlined in 404.1520 apply to the evaluation of physical and mental impairments. In addition, when we evaluate the severity of mental impairments for adults . . ., we must follow a special technique at each level in the administrative review process. We describe this special technique in paragraphs (b) though (e) of this section. . . .

(b)    *Use of the technique.*

    (1)    <u>Under the special technique, we must first evaluate your pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment(s). . . .</u> If we determine that you have a medically determinable mental impairment(s), we must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document our findings in accordance with paragraph (e) of this section.

    (2)    <u>We must then rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of this section and record our findings as set out in paragraph (e) of this section.</u>

(c)    *Rating the degree of functional limitation.*

    (1)    Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2)    We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3)    We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.

(4)    When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

(d)    *Use of the technique to evaluate mental impairments.* After we rate the degree of functional limitation resulting from your impairment(s), we will determine the severity of your mental impairment(s).

(1)    If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities (see §404.1521).

(2)    If your mental impairment(s) is severe, we will then determine if it meets or is equivalent in severity to a listed mental disorder. We do this by comparing the medical

findings about your impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. We will record the presence or absence of the criteria and the rating of the degree of functional limitation on a standard document at the initial and reconsideration levels of the administrative review process, or in the decision at the administrative law judge hearing and Appeals Council levels (in cases in which the Appeals Council issues a decision). See paragraph (e) of this section.

(3)     If we find that you have a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, we will then assess your residual functional capacity.

(e)     *Documenting application of the technique.* At the initial and reconsideration levels of the administrative review process, we will complete a standard document to record how we applied the technique. <u>At the administrative law judge hearing and Appeals Council levels (in cases in which the Appeals Council issues a decision), we will document application of the technique in the decision.</u>

. . .

(2)     <u>At the administrative law judge hearing and Appeals Council levels, the written decision issued by the administrative law judge or Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.</u>

. . .

(Emphasis added).

The ALJ evaluated Plaintiff's "pertinent symptoms, signs, and laboratory findings," relative to depression, anxiety, and PTSD; rated Plaintiff's degree of limitation; and then evaluated Plaintiff's mental impairment in conformance with the above. The ALJ "considered the longitudinal record"

when he evaluated Plaintiff's symptoms, the opinions of his treating psychologist, and the opinions of his treating psychiatrist, including the mental status report. He found Psychologist Klein's opinions were not supported by "any contemporaneous medical records" or "detailed mental status findings" but were "based primarily on a consideration of the claimant's alleged physical symptoms" and were inconsistent with other evidence in the record. He rejected these opinions (R. 20, 26). The ALJ evaluated and weighed the opinions of Plaintiff's treating psychiatrist, Dr. Attia, who rated Plaintiff's GAF at 65; found Plaintiff was responding well to treatment; noted Cymbalta was helpful to Plaintiff; opined Plaintiff's memory was fair, Plaintiff's intelligence was average, and he was alert and fully oriented. Based on this evidence and his evaluation thereof, the ALJ found Plaintiff "may have some depression and anxiety secondary to his ongoing physical problems . . ." (R. 20, 21, 26).

The ALJ then rated the degree of functional limitations in accord with 20 C.F.R. §§404.1520a(c)(2)(3)(4). The ALJ rated Plaintiff's functioning in all "four broad functional areas . . . . [a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *See* 20 C.F.R. 404.1520a(c)(3). As required, the ALJ rated Plaintiff's limitations: he found Plaintiff's limitation as to his activities of daily living was mild; limitation as to his social functioning was mild; and limitation as to his concentration, persistence, and pace was mild. The ALJ found Plaintiff had had no episodes of decompensation. *See* 20 C.F.R. 404.1520a(c)(4) (R. 21).

Having completed rating Plaintiff's limitations, the ALJ was required to evaluate the severity of Plaintiff's mental impairments, which he did. Inasmuch as Plaintiff's rated degrees of limitation were "mild" and "none," the ALJ found Plaintiff's mental impairment was not severe. *See* 20 C.F.R. §404.1520a(d)(1) (R. 20, 21).

Finally, the ALJ documented his application of the technique in his decision. He "incorporate[d] the pertinent findings and conclusions based on the technique" in his decision by including his analyses of "the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section" *See* 20 C.F.R. 404.1520a(e)(2). The ALJ discussed and evaluated Plaintiff's mental treatment history, the opinions of treating mental health professionals, Dr. Attia's mental status examination, and Plaintiff's own statements about his activities and limitations in his decision. The ALJ expressly listed and discussed all four broad functional areas and he included his rating for each (R. 20-22). The ALJ's technique in analyzing and making conclusions about Plaintiff's mental impairment was not in error.

For the above stated reasons, the undersigned finds substantial evidence supports the ALJ's decision that Plaintiff's mental impairment was not severe.

### D. Treating Physician

Plaintiff contends the ALJ erred in failing to afford appropriate weight to the opinions of Plaintiff's treating psychologist as required by SSR 96-2p. Defendant asserts the ALJ "articulated reasonable bases for not accepting the . . . assessment[]" of Psychologist Klein (Defendant's brief at p. 10).

In addition to the above recited finding by the ALJ as to the opinion evidence submitted by Psychologist Klein (*see* p. 26 of this document), the ALJ made the following decision:

> As for the opinion evidence, as detailed above, the undersigned rejects the opinions of Psychologist Klein contained in the assessment dated January 25, 2006, as this treating source submitted no detailed mental status examination findings to support the opinions and his opinions are found to be based primarily on the claimant's

subjective complaints. Further, these opinions are inconsistent with the detailed findings reported by Dr. Attia and his opinions that the claimant had mild mental impairments (Exhibit 22F) (R. 26).

SSR 96-2p provides:

Controlling weight. This is the term used in 20 CFR 404.1527(d)(2) and 416.927(d)(2) to describe the weight we give to a medical opinion from a treating source that must be adopted. The rule on controlling weight applies when all of the following are present:

1.    The opinion must come from a "treating source," as defined in 20 CFR 404.1502 and 416.902. Although opinions from other acceptable medical sources may be entitled to great weight, and may even be entitled to more weight than a treating source's opinion in appropriate circumstances, opinions from sources other than treating sources can never be entitled to "controlling weight."

2.    The opinion must be a "medical opinion." Under 20 CFR 404.1527(a) and 416.927(a), "medical opinions" are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight. (See SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner.")

3.    The adjudicator must find that the treating source's medical opinion is "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques. The adjudicator cannot decide a case in reliance on a medical opinion without some reasonable support for the opinion.

4.    Even if well-supported by medically acceptable clinical and laboratory diagnostic techniques, the treating source's medical opinion also must be "not inconsistent" with the other "substantial evidence" in the individual's case record.

If any of the above factors is not satisfied, a treating source's opinion cannot be entitled to controlling weight. It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record. However, when all of the factors are satisfied, the adjudicator must adopt a treating source's medical

opinion irrespective of any finding he or she would have made in the absence of the medical opinion.

Psychologist Klein was a treating source. He counseled Plaintiff, according to his July 18, 2006, Summary of Services report, twelve times from September, 2005, to June, 2006. Psychologist Klein's opinions were medical opinions as Psychologist Klein qualified as a medical source. His opinions included information about the nature and severity of Plaintiff's mental impairments. The ALJ did not take exception to these facts.

The ALJ found Psychologist Klein's opinions as to Plaintiff's limitations caused by his mental impairments were not "well supported" by "medically acceptable" clinical and laboratory diagnostic techniques; he found Psychologist Klein offered no "reasonable support for" his opinions. *See* 96-2p(3). The ALJ found Psychologist Klein's reports were based on Plaintiff's subjective complaints and "contain[ed] no detailed mental status finding" (R. 20). Plaintiff argues that mental impairments "are not supported by your general objective tests, such as MRIs and CT Scans. They require a mental health professional to evaluate the symptoms, the history, and the examinations and determine the diagnosis" (Plaintiff's brief at p. 10). 20 C.F.R. §416.913(b)(2) identifies a mental status examination as the medically acceptable type of medical report in the evaluation of mental impairments. Psychologist Klein offered two Summary of Services reports and a Medical Assessment of Ability to do Work-Related Activities – Mental, none of which contained a detailed mental status examination (R. 271, 289-90, 291-93). These summaries and the medical assessment by Psychologist Klein do not contain the information Plaintiff argues must be considered by an ALJ in making findings as to Plaintiff's mental impairments – an evaluation of the symptoms, Plaintiff's history, and detailed examination notes.

The ALJ made a determination that Psychologist Klein's opinions were not consistent with the other evidence of record. Specifically, the ALJ found Psychologist Klein's opinions conflicted with those of Dr. Attia, Plaintiff's treating psychiatrist. Plaintiff argues that the only difference between the two opinions is the GAF score determined by each (Plaintiff's brief at pp. 11 and 12). The ALJ recognized that Psychologist Klein found Plaintiff's GAF was 50 to 55 and Dr. Attia found Plaintiff's GAF was 65 (R. 20). The undersigned finds the ALJ considered and identified other inconsistencies. The ALJ noted Psychologist Klein found Plaintiff had a "poor" or "no[ne]" ability to perform mental work-related activities (R. 21). Dr. Attia found Plaintiff to be cooperative; he had clear speech; he showed no articulation problems; he got along well with others; he was alert and pleasant; he was of average intelligence; he had "'fair'" memory; and he was fully oriented and alert (R. 20-21). Additionally, the record of evidence revealed that Psychologist Klein opined, on January 25, 2006, that Plaintiff's prognosis was poor, his medication was minimally effective, and he was in a constant state of anxiety; however, Dr. Attia found, on June 6, 2006, that Plaintiff's mood had improved, his medication was improving his symptoms, he was responding fairly well to his treatment, and his visits to Dr. Attia could be reduced due to these improvements (R. 289-90, 301). Psychologist Klein found Plaintiff's ability to remember and understand job instructions was poor; Dr. Attia found Plaintiff had fair insight, fair abstract thinking, fair fund of knowledge, and fair memory (R. 292, 304). Finally, Psychologist Klein diagnosed major depressive disorder, recurrent, severe, with psychotic features; posttraumatic stress disorder; and generalized anxiety disorder; Dr. Attia diagnosed depressive disorder, NOS, and generalized anxiety disorder (R. 271, 289, 302-04). The record, as detailed above, contains significant examples, in addition to the GAF evaluation, of how Psychologist Klein's opinions are inconsistent to those of Dr. Attia.

In addition to Psychologist Klein's opinions being inconsistent to the opinion of Dr. Attia, they were also inconsistent to statements made by Plaintiff. The ALJ noted Plaintiff reported to Dr. Attia that Cymbalta "had been helpful," but Psychologist Klein opined Plaintiff's medication was minimally effective (R. 20, 290). The ALJ noted Plaintiff told Dr. Attia that he did some light housework and watched television and testified at the administrative hearing that he cooked, drove, shopped, stargazed, and read, but Psychologist Klein found Plaintiff had no ability to maintain attention or to concentrate (R. 21, 292). The ALJ noted Plaintiff informed Dr. Attia that he got along well with others, but Psychologist Klein found Plaintiff 's ability to behave in an emotionally stable manner and relate predictably in social situations was poor (R. 21, 293).

Based on the above analysis, the undersigned finds substantial evidence supports the ALJ's decision that Psychologist Klein's opinions were not well supported by medically acceptable evidence and were inconsistent with the opinions of Plaintiff's treating psychiatrist and were, therefore, not entitled to controlling weight.

Plaintiff next argues the ALJ, after he decided Psychologist Klein's opinion was not entitled to controlling weight, erred by not "perform[ing] the second part of the analysis required by . . . 20 C.F.R. §404.1527" (Plaintiff's brief at p. 9). 20 C.F.R. §404.1527 mandates the following:

> (d) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> . . .
>
> (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of

individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.</u> When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> (i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a umber of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

> (ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

The ALJ evaluated the treating relationship Psychologist Klein had with Plaintiff. As noted,

Plaintiff was counseled by Psychologist Klein, who treated him from September 28, 2005, through

June 6, 2006. The ALJ found Psychologist Klein's reports lacked supportability as he failed to include any "detailed mental status findings" or "contemporaneous medical records" to confirm the information found in the reports; his assessments of Plaintiff's mental impairments were based on Plaintiff's alleged physical symptoms; and his opinions lacked the "relevant evidence," such as mental status reports or any treatment notes, to support the three reports. *See* 20 C.F.R. §404.1527(d)(3). As noted previously, the ALJ considered the consistency of Psychologist Klein's opinions with the other evidence of record. His opinions were inconsistent with Dr. Attia opinions and Plaintiff's statements about the limitations his mental impairment caused him.

The undersigned finds, therefore, that the ALJ did not err in evaluating Psychologist Klein's treating relationship with Plaintiff or the supportability and consistency of his opinions as mandated by 20 C.F.R. §404.1527.

Plaintiff argues that had the ALJ "wanted a copy of the detailed mental status evaluation by [Dr.] Klein . . . . the hearings office's own policy manual requires the ALJ to request that information . . ." (Plaintiff's brief at pp. 10-11). Plaintiff relies on the language in HALLEX I-2-5-14, which reads as follows:

> When an ALJ needs additional information about a claimant's impairment(s), he or she will determine if the information may be available from a treating source or other medical source. . . . If the ALJ determines that the information may be available from a treating source or other medical source, he or she will attempt to obtain the information by following the procedures in subsections A., B. and C., below.

HALLEX I-2-5-14 does not, as argued by Plaintiff, "require[]" the ALJ to obtain additional information if he "wanted" it; the rule outlines the methods by which requested medical records and/or information can be obtained. 20 C.F.R. §404.1527(a)(2)(c)(3) provides the following: "If the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, or

if after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled, we will try to obtain additional evidence . . . ." The ALJ did not find the evidence submitted by Psychologist Klein to be inadequate or insufficient; he found Psychologist Klein's opinions were not "support[ed] . . . by any contemporaneous medical records" or "objective mental status findings" and were inconsistent with other evidence of record (R. 21). There is nothing in Psychologist Klein's January 25, 2006, Summary of Services; January 25, 2006, Medical Assessment of Ability to do Work-Related Activities (Mental); or July 18, 2006, Summary of Services to suggest that the opinions expressed therein were based on any objective mental status findings or that such an evaluation, as completed by Psychologist Klein, existed. Psychologist Klein wrote that "[t]he nature and severity of [Plaintiff's] psychological symptoms are consistent with the clinical analysis, [sic] and the emotional trauma caused by his loss of any physical ability to perform any physical labor. The depression is severe. The flashbacks and nightmares which he experiences as a result of the trauma of the debilitating cancer and its impact on all areas of his ego state are overwhelming to him. Observations by the average layman would confirm the effects of the cancer" (R. 289). In evaluating Plaintiff's depression, Psychologist Klein does not refer to any mental status evaluation. The report does not contain any opinion as to Plaintiff's concentration, pace, persistence, judgment, speech, affect, cooperation, intelligence, memory, insight, thinking, and orientation. In Psychologist Klein's Medical Assessment of Ability to do Work-Related Activities (Mental), he based his findings as to Plaintiff's ability to make occupational adjustments and other work related activities on the information contained in the Summary of Services report, not on any objective mental evaluation (R. 291-92, 293). Likewise, Psychologist Klein did not base his findings as to Plaintiff's ability to make performance adjustments and to make personal-social adjustments on any evaluations or mental ability testing (R. 292-93).

42

Additionally, the evidence as a whole was not inadequate or insufficient for the ALJ to reach a conclusion as to Plaintiff's mental impairments; the ALJ considered and relied on Dr. Attia's mental status evaluation and opinions to determine Plaintiff's mental impairment was not severe. The ALJ, in accord with 20 C.F.R. §§404.1521, 1520a, and 1512, 20 C.F.R. §416.913, and SSR 96-2p, considered, evaluated, and weighed the evidence of both Psychologist Klein and Dr. Attia to make a determination that Plaintiff's mental impairment was not severe. The undersigned finds the ALJ did not err in not seeking to obtain additional evidence from Psychologist Klein.

The undersigned finds substantial evidence supports the ALJ's decision as to the weight he assigned to the opinion of Plaintiff's treating psychologist.

### E. Credibility

Plaintiff contends the ALJ erred in failing to properly evaluate Plaintiff's credibility in that he failed to evaluate corroborating evidence from friends and family in making his credibility determination. The evidence to which Plaintiff refers is five letters from family members and friends. Defendant contends substantial evidence supports the ALJ's determination that Plaintiff was not fully credible about the nature and extent of his functional limitations.

The Fourth Circuit, in *Craig v. Chater*, 76 3d. 585, has developed a two-step process for determination of whether a person is disabled by pain or other symptoms. It mandates the following:

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

*Craig*, supra at 594.

In his decision, the ALJ found the following: "After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms . . ." (R. 23). The ALJ determined Plaintiff met the first-step threshold in *Craig*, supra; he, therefore, had to conduct the evaluation at step two.

In his decision, the ALJ found the following as to Plaintiff's credibility:

At the hearing, the claimant testified that he felt better after his treatment for hepatitis C, but that he then had to have treatment for melanoma on his back and lymph nodes removed under each arm. The claimant testified that he had loss of strength in his arms and that he must wear elastic sleeves on his arms above the elbows to reduce the swelling in his arms. He complained of pain under both arms and in the rib cage area, with the pain under his arms feeling like the sensation of steel wool under his arms. He complained of swelling throughout his arms, underneath his breasts and in his fingers. The claimant testified that after playing a video game for five to ten minutes he has increased numbness and tingling in his hands and they get "ice cold." He testified that his wife must put on his belt and zipper his pants. The claimant complained of difficulty reaching out in front of his body, testifying that he feels like something is pulling back his arms. The claimant complained of difficulty elevating his arms. He testified that he has difficulty lifting a gallon of milk out of the refrigerator. The claimant testified that he must rest his arms during the day for a period of one and one-half hours. He complained of arthritic pain in his knees and arms. He testified that his legs get tired and that he has difficulty with prolonged standing or walking. The claimant complained of breathing difficulty in the morning

44

and testified that he occasionally has asthma attacks when he wheezes "real bad" (R. 23).

At the hearing, the claimant testified that he did some light cleaning and cooking and some shopping. He testified that he enjoyed stargazing with a telescope. He testified that he did some reading and watched a lot of television. . . . [H]e also testified that he is able to drive a vehicle (R. 21).

[T]he undersigned finds that the claimant has exaggerated the nature and extent of his limitations and that his testimony regarding the degree of his limitations is not fully credible. The claimant does have an excellent work record at a high income level, but he apparently feels that he qualifies for disability based on an inability to perform his former, rather strenuous work. He has shown no motivation to seek rehabilitation services and testified that his source of income is his 401K from his prior job. The claimant has admitted that his hepatitis C was cured by the prior treatment and he has reported improvement with prescribed medication and physical therapy. In this regard, despite his complaints of ongoing pain in the upper extremities he has had no physical therapy since March 2005. The claimant has also admitted that the compression sleeves help with his swelling in the arms, but he has complained about having to wear them so much (Exhibit 12F). Further, as detailed above, the claimant has received limited treatment for his complaints of depression and he had improvement with the treatment. As detailed above, the overall record fails to establish the presence of any severe mental impairment. In this regard, the claimant's daily activities, as detailed above, are inconsistent with the degree of pain and functional limitations alleged at the hearing (R. 26).

In making this credibility determination, the ALJ relied on Plaintiff's testimony about his limitations and found it was not supported by the medical evidence or record. The ALJ did not rely on the opinions of lay persons as contained in the letters from family and friends. As this evidence is from "other sources" and could have been discussed in the ALJ's decision, the fact that he did not discuss it means he did not consider "all available evidence." In this particular case, such failure to discuss and consider the letters is harmless error as doing so would not have changed the outcome of his decision. The Fourth Circuit, in *Mickles v. Shalala*, 29 F.3d 918, 921 (1994), held that the Commissioner's decision should be upheld if there is "no question that he would have reached the same result notwithstanding his initial error." Additionally, even though he did not discuss each

letter, the ALJ did include and consider, in his analysis of Plaintiff's credibility, the limitations about which Plaintiff's family and friends wrote.

As detailed above on pages twenty-one and twenty-two of this Report and Recommendation/Opinion, the following letters were submitted:

- On April 30, 2005, Jonathan Kirby wrote that Plaintiff had to rely on others to lift "even light things" after the surgery to remove the melanoma and lymph nodes, his arms were swollen, he was tired, he was "sad," and he was in pain (R. 103, 132)[2];
- Kathleen Angus wrote, in a letter dated May 3, 2005, that Plaintiff had difficulty lifting more than ten pounds above his head after the surgery to remove the melanoma and lymph nodes; he could not exercise, bowl, or complete household chores; he could not use his hands to pick up small objects due to rheumatoid arthritis; his arms would swell and become "sore"; he was tired and had to take naps in the day; he could not kneel; he was depressed, did not provide "complete attention" to her when she spoke to him, had become a "hermit"; and his "mind [was] not fully on the program" when he watched television (R. 102, 131);
- Joseph Schultz wrote, on May 9, 2005, Plaintiff was challenged by chores; his going to work was impossible; he had become depressed and irritable; he could not bowl or lift weights; and he did not want people to visit him (R. 105, 130);
- Witold Zabawski wrote a letter, dated May 20, 2005, which read Plaintiff had changed after his operation in that he had "lost his sense of humor and passion for work" (R. 104, 129);
- Lori Radkiewicz's May 4, 2005, letter contained her opinion that since Plaintiff had become sick, had surgery, and was unable to work, he had become "very depressed and frustrated" because he could not do "the things he used to do" (R. 106, 128).

In his argument, Plaintiff relies on SSR 85-16, which identifies the issues to be considered in determining an individual's capacity to engage in basic work-related activities when that individual has a mental impairment. It reads:

---

[2]Mr. Kirby also wrote that Plaintiff had worked during the time he was treated for hepatitis C. He wrote that Plaintiff's treatments caused him to be "sick for about a half a year," but he continued to work and returned to being a "workaholic" when his treatments concluded (R. 132). The ALJ considered and evaluated Plaintiff's hepatitis C by analyzing the evidence of Drs. Harris and Kazbay. The ALJ "resolved all doubts in the claimant's favor in finding his hepatitis C [was] a severe impairment, but conclude[d] that the objective findings related to this condition have been adequately accommodated by limiting the claimant to the above-detailed range of light work" (R. 23). The ALJ adequately evaluated Plaintiff's hepatitis C symptoms.

"Other evidence also *may* play a vital role in the determination of the effects of impairment. To arrive at an overall assessment of the effects of mental impairment, relevant, reliable information, obtained from third party sources such as . . . previous employers, family members . . ., *may* be valuable in assessing an individual's level of activities of daily living. Information concerning an individual's performance in any work setting . . . as well as the circumstances surrounding the termination of the work effort, *may* be pertinent in assessing the individual's ability to function in a competitive work environment." (Emphasis added.)

Defendant argues the ALJ complied with SSR 06-03p, which reads:

In addition to evidence from "acceptable medical sources," we *may* use evidence form "other sources" . . . to show the severity of the individual's impairment(s) and how it affects the individual's ability to function . . . . Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicatory *generally should explain* the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, *when such an opinion may have an effect on the outcome of the case.* (Emphasis added.)

In both citations, it is clear that the regulations provide that an ALJ *may* consider the opinions of previous employers, family members, friends, and "other sources" in determining Plaintiff's credibility; such consideration is not mandated by either regulation. The ALJ, in this case, did not discuss, in his decision, the letters in his credibility analysis of Plaintiff, but he did evaluate the evidence as produced through Plaintiff's testimony and "acceptable medical sources," which he was required to do. Because the ALJ did evaluate and analyze the limitations as expressed in the letters, but not the letters themselves, the information found therein, if evaluated and analyzed as evidence from "other sources," would not have had an effect on the outcome of the case.

In his letter, Mr. Kirby wrote Plaintiff was "sad." Ms. Angus wrote Plaintiff was depressed, did not provide "complete attention" to her when she communicated with him, did not fully focus on television programs he watched, and did not socialize. Mr. Shultz wrote Plaitiff was depressed,

was irritable, and did not socialize. Mr. Zabawski wrote Plaintiff had "lost his sense of humor." Ms. Radkiewicz wrote Plaintiff had become depressed and frustrated because he could do the physical things he used to do. The ALJ found Plaintiff's mental impairment was not severe. In doing so, he relied on the opinion of Plaintiff's treating psychiatrist, who found Plaintiff's medication, Cymbalta, had been helpful; his GAF was 65; he was responding well to treatment; and his psychiatric visits could be reduced due to his improvements (R. 20). The ALJ evaluated Dr. Attia's findings that Plaintiff was cooperative, had clear speech, was of average intelligence, had fair memory, and was alert and fully oriented. Additionally, the ALJ relied on Plaintiff's statements to Dr. Attia that he watched television and he was getting along well with others (R. 21). Finally, the ALJ considered Plaintiff's testimony that he stargazed with a telescope, cleaned, cooked, shopped, read, watched television, drove, and played video games (R. 21, 23). Plaintiff reported to Dr. Pearson on July 5, 2006, that the psychiatric care he was receiving and medication he had been taking for depression and anxiety had helped (R. 263). The evidence considered by the ALJ as to Plaintiff's depression was valid and his examination and analysis of that evidence was thorough. The limitations noted by Plaintiff's family and friends were addressed in the ALJ's decision relative to Plaintiff's feeling "sad," feeling depressed, feeling unsocial, not concentrating, and being irritable in that they were evaluated for consistency and supportablility. Substantial evidence supports the ALJ's credibility finding as to Plaintiff's mental impairment(s).

As to the information contained in the letters relative to Plaintiff's physical impairments, the ALJ considered the same evidence, but from other sources. In making his credibility determination as to Plaintiff's physical impairments, the ALJ again relied on both Plaintiff's testimony and acceptable medical sources.

In their letters, Mr. Kirby wrote Plaintiff had to rely on others to lift light items and Ms. Angus opined Plaintiff had difficulty lifting more than ten pounds. In his decision, the ALJ considered evidence relative to Plaintiff's ability to lift, from Dr. Brager, who found Plaintiff had no edema in his extremities, 5/5 motor strength, and intact sensation. Dr. Harris' opinion that Plaintiff did not have rheumatoid arthritis in his hand or shoulders and that Plaintiff's symptoms improved with a Kenalog injection and use of Celebrex was evaluated by the ALJ (R. 24). The ALJ also noted that Plaintiff's range of motion and strength in his shoulders had increased after physical therapy (R. 25). Additionally, the ALJ weighed the testimony of Plaintiff, who stated he had loss of strength in his arms, had difficulty lifting a gallon of milk out of the refrigerator and that he must rest his arms during the day for a period of one and one-half hours. The ALJ also evaluated Plaintiff's testimony that he difficulty reaching out in front of his body. The information contained in the letters as to Plaintiff's ability to lift was considered by the ALJ. The ALJ accommodated Plaintiff's credible allegations as to his lifting limitation as mentioned in the letters of Mr. Kirby and Ms. Angus in his RFC by limiting Plaintiff to light work. Additionally, the ALJ modified Plaintiff's limitation to light work by determining Plaintiff could perform no overhead reaching and no reaching more than eighteen inches in front of his body (R. 22).

Ms. Angus wrote Plaintiff could not use his hands to pick up small objects due to rheumatoid arthritis. The ALJ fully considered the relative objective medical evidence and Plaintiff's testimony about this symptom in his credibility analysis. The ALJ considered Plaintiff's testimony that his fingers would swell and that his hands would tingle, go numb, and become "ice cold" when he played video games. Plaintiff stated he had difficulty putting on his belt and zippering his pants (R. 23). Plaintiff did not testify he could not pick up small objects. Additionally, the ALJ relied on

Plaintiff's March 16, 2006, right hand x-ray, that "suggest[ed] degenerative joint disease" and no changes in arthritis, and his left hand x-ray, that showed "[c]hanges suspicious for degenerative joint disease" (R. 22, 318-19). The ALJ also noted Plaintiff's rheumatoid factor was negative in December, 2004, and Dr. Harris' finding that Plaintiff did not have rheumatoid arthritis (R. 24). In his decision, the ALJ found the following: "The undersigned finds that the claimant has failed to establish a basis for any manipulative limitations related to his complaints of swelling of the hands as the record fails to establish any ongoing objective findings related to these complaints. In this regard, Dr. Brager reported that the claimant had swelling of the hands only on one occasion, January 12, 2006 (Exhibit 11F) and the reports from Dr. Pearson fail to document any findings to support this complaint" (R. 25). The ALJ's decision is also supported by Dr. Castaldo's March 14, 2005, finding and Dr. Jiminez's June 26, 2005, finding that Plaintiff had no manipulative limitations (R. 203, 237). The ALJ considered Plaintiff's complaints as to manipulation and based his decision as to Plaintiff's credibility on the above objective medical evidence and Plaintiff's testimony.

Mr. Kirby and Ms. Angus both wrote that Plaintiff experienced arm swelling. The ALJ addressed that complaint in his decision. The ALJ considered Plaintiff's testimony that he treated the swelling in his arms by wearing compression sleeves, which helped (R. 24, 26). The ALJ considered the evidence by Dr. Brager that Plaintiff had no palpable lymphadenopathy and only 1+ arm edema (R. 24). This evidence led the ALJ to the following conclusion: "The findings reported by the treating oncologists establish that the claimant has a basis for some upper extremity swelling associated with his axillary node dissection. However, these residuals have been adequately accommodated by limiting the claimant to the range of light work detailed above, including the limiting reaching and the postural limitations" (R. 24). The ALJ, even without including the letter

opinions of Mr. Kirby and Ms. Angus in the analysis, addressed Plaintiff's complaints of arm swelling and accommodated that symptom in the RFC.

The ALJ weighed and considered the opinions of Ms. Angus and Mr. Kirby that Plaintiff was tired. In his decision, he noted Plaintiff had complained of tiredness to Dr. Berry, but that Dr. Berry had opined that Plaintiff "looked generally well and that he had no obvious biochemical or physical findings to support his complaints" of tiredness (R. 24). The ALJ, however, accommodated the opinions of Ms. Angus and Mr. Kirby in that he reduced Plaintiff's RFC to light, with modifications, including Plaintiff's having to miss up to one day of work per month.

The ALJ addressed Plaintiff's activities of daily living in his credibility assessment even though he did not address the opinion of Ms. Angus that Plaintiff could not bowl, exercise, or do household chores or the opinion of Mr. Schultz that Plaintiff found doing chores a challenge and that he could no longer bowl or lift weights. The ALJ considered Plaintiff's testimony that rebutted those opinions; Plaintiff did do household chores. He also cooked, shopped, star gazed, watched television, read, and drove a car. The ALJ found Plaintiff's activities were inconsistent with the functional limitations he alleged at the hearing. As to Plaintiff's inability to exercise, the ALJ did opine that Plaintiff could perform only modified light work; he could not reach overhead or more than eighteen inches in front of his body, could perform postural movements only on an occasional basis, and could not climb (R. 22-23). The ALJ thoroughly evaluated Plaintiff's credibility as to his activities of daily living and based that evaluation on the valid evidence of record.

As to Ms. Angus' opinion that Plaintiff could not kneel, the ALJ considered that symptom in his decision. He noted Plaintiff testified he had arthritic pain in his knees, but found that symptom was treated with a Kenalog injection and Celebrex, from which Plaintiff realized improvement of

his symptoms (R. 23, 24). Additionally, a March 16, 2006, x-ray showed mild lateral positioning of Plaintiff's right knee patella. The ALJ found he had accommodated this symptom by reducing Plaintiff's RFC to light, with modifications. The undersigned agrees.

Finally, Mr. Shultz' and Ms. Radkiewicz's opinions that Plaintiff found it impossible to go to work or was unable to work are opinions reserved to the Commissioner. *See* 20 C.F.R. 404.1527(e)(1). These assessments of Plaintiff's ability to do work by lay people would not have been considered by the ALJ, based on his expressed opinion that the decision that a person is disabled and unable to work is always reserved to the Commissioner (R. 16).

The undersigned, therefore, finds that the ALJ overcame his error of not specifically listing, in his decision, the five letters from family and friends, which contained opinions about Plaintiff's limitations, by analyzing the exact limitations, as complained of by the Plaintiff and treated or evaluated by Plaintiff's doctors, and accommodating those limitations, when severe, in the RFC. Substantial evidence supports the decision of the ALJ.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States

District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this ___*12*___ day of ___*June*___, 2008.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE